Good morning, your honors. I'd like to serve two minutes of rebuttal time. Good morning, your honors. I'd like to serve two minutes of rebuttal time. May it please the court, Anthony Colombo on behalf of the defendant appellant, James Folsom. In this case, the evidence was insufficient to establish that Mr. Folsom made a false statement to a financial institution, committed bank fraud, and committed wire fraud. We're taking each one of these at a time. With regard to count one, the Mr. Colombo, I'm having a hard time hearing you. Could you maybe talk a little more into the mic? Thanks. Yes. With regard to count one, the false statement to a financial institution, the government alleged that there was three representations that were made or declarations that were made on the universal residential loan application, those being that there were no outstanding judgments against him, that he was not currently delinquent on any obligation, and that he had held property in his name solely within the last three years. In looking at this case, the evidence was insufficient because there was sufficient evidence to establish that Mr. Folsom had a good faith belief in the truth of those declarations at the time that the closing occurred. Well, not the no judgments. I mean, that question says no judgments against you, right? Or I can't remember the exact language. But that, to me, seemed like, no, that one your client definitely did not get. Well, I would disagree, Your Honor, and here's the reason why. The indictment and the evidence presented by the government is that the false statements were made at the time of the closing, July 13th of 2013. But we have to look at all of the information prior to that and leading up to what and why that answer was stated in that way, that there were no outstanding judgments. And we have to look at Mr. Folsom's conduct. And the first is we can't look at that question in isolation. We have to look at the offer letter. And the offer letter clearly said no. We don't. We look at the question posed to him. And just read the question as it's phrased on the loan application. But it's, yes, it is, are there any outstanding judgments against you? Okay. And there was. There was an outstanding judgment. However, we have to look at what the offer letter said. And the offer letter said Why? Who cares what the offer letter says? Because we're determining whether Mr. Folsom had a good faith belief in his representation at that particular time. In plain, I don't know. It's not like this is some complicated esoteric legal subject that he's asked on the loan application. It's a pretty basic question that anyone with a fourth grade education could understand. I don't understand why we would care what some prior offer letter that he got months before would say. Because the offer letter defined any judgments against him as judgments affecting title to the property. That's what the bank was concerned with. And in looking at this, the lien, the judgment and the lien was not filed against the property. The lien was filed against him personally. In addition, when you look at Mr. Folsom's conduct, he was completely transparent the entire time. He went to the bank. He inquired about the loan. About the judgment in the criminal case? Well, but we have to look at whether Mr. Folsom had a good faith belief in that representation at the time that he made it on the declaration. And if you look, Your Honor, he was completely transparent. He provided all of his truthful information, all his biological information. How is he completely transparent if he doesn't tell the bank that he has this massive judgment against him? Because the question is whether he believed it was just a judgment or whether it was a judgment affecting title to the property. Did he testify to what his belief was? No, Mr. Folsom did not testify, Your Honor. So isn't the jury then entitled to look at whatever evidence was presented and decide based on what was presented that this was an intentional whopper? Well, yes. And I am discussing only the evidence that was presented. And when you look at the evidence presented, it was clear that Mr. Folsom had provided the bank with his truthful name, social security number, date of birth, so that they could conduct a credit check. In addition, they all, he provided that information so that they could do a title report. So prior to going on for several months in May, June, and then leading up to the closing in July, Mr. Folsom, there was no evidence that he had a title report. There was some due diligence that was done by the bank. Did he represent that he owned the house in his own name? Well, that's the third statement on the declaration. I didn't hear your answer. Did he or didn't he? His application. Did he say he owned 10905 Prospero Drive, San Diego, solely in his name? Yes. And if I could get to that in one second, if I could just finish with the first. That's not true, though, is it? Well, actually, at the time that the closing occurred, it would have been true. At the time of the application when he made the representation, that wasn't true. Well, Your Honor, that's not what he was charged with. He was charged in the indictment with making a false statement on July 12th of 2013, which was the date that the closing occurred. At the time that the closing occurred, had TitleSource provided the documents that they were supposed to with transferring the title deed, that would have been a true representation for that moment during the title. Because what was supposed to happen was TitleSource was supposed to, and this was all done prior to May, June, and July. The bank was totally aware that Mr. Folsom held title in the name of Rosemont Mission. And they said, well, the way to remedy that is at the time of closing, we will have a transfer deed deeding the property from Rosemont Mission to Mr. Folsom individually. And then the bank also agreed at Mr. Folsom's request to then transfer a second deed transferring title back into Rosemont Mission from Mr. Folsom. So on July 12th of 2013, the only thing that made that representation false was the title company's failure to follow through and place those documents. And we have testimony from the notary agent that the closing goes very fast. They flip through the documents, you sign. So there was nothing that Mr. Folsom did not have any control over TitleSource's failure to provide those documents, which would have made that representation true at the time. But getting back to the judgment, because I think that's what Judge Watford's concern is, in looking at Mr. Folsom's conduct as to whether he could have had a good-faith representation at the time that he made this declaration, the bank had two months of due diligence. And he provided them with all the information that he could. That's where I had a question. Are you suggesting that because he was transparent about his name and Social Security number, that that would have led to their discovery of the judgment against him? Absolutely, it should have. Okay, so if that's the case and that was his good faith, why didn't he just say yes to the answer to the question? Because it's a more confusing question than you asked, because in the offer letter it says a judgment affecting title to the property. And the lien was never, the government never filed title or never filed the lien against the title to the property. It was filed against him personally. So it wasn't as simple. Counsel, I'm looking at the form. It says, are there any outstanding judgments against you? Yes. Where does it say anything about the property? Well, in the offer letter, he was solicited by Chase. Yes, and what we're looking at is whether Mr. Folsom had a good faith belief at the time that he answered that question that he was answering it correctly. And what I'm saying is that you can't ignore how a judgment is defined in the offer letter by the bank that he received. It's Government's Exhibit 70, it's Excerpt of Record 106, and it clearly defines a judgment affecting title to the property. Now, that's just one part of the equation. The bank has time to do due diligence, and they never bring up that there's any judgment or anything affecting his ability to go forward with a loan. He was truthful in providing his information. They ran all of the checks, and they could have and should have found out that there was this outstanding judgment, and they didn't. So at the time that he's making this representation, to him, he had a good faith belief that it's truthful. Now, reasonable doubt can come from evidence of the lack thereof. In addition, we also have the fact that Ms. Ibarra, who was the initial loan originator, she testified that she had no specific recollection as to the conversation that Mr. Folsom had. But, of course, she would have answered any questions. And we know that Mr. Folsom did have questions, because he did go to the bank and spoke to a bank employee, Mr. Gaines, about some issues concerning the title. So there would have been some conversation that occurred. But I think more importantly, in looking at reasonable doubt and the lack of evidence, is that the government never called Matthew Speranza, who was the loan officer, who actually had numerous conversations with Mr. Folsom. But that evidence was never put on. So we can't just look at the question in isolation when we're considering good faith. And that's the argument here, is that you actually have to look at all of what happened prior to July, leading up to July 13th and 2013, the closing. Now, in terms of the current delinquency, I'll just spend a second on that, because there's, as of July 13th of 2013, Mr. Folsom never received any delinquent notice. He had been told, and the testimony was that they were trying to work with him. He immediately applied for modification of his payments. Cut you off, because you're already over your time. But let me ask you this, because I think you're right on the delinquency one. But, so let's say that the, let's just talk about the 1014 count for a second. There were three separate statements that the government alleges. Let's say we were to conclude that there was sufficient evidence for two of them, but not for one. Does that invalidate the conviction, or does the government just need sufficient evidence as to one of the statements to win? Well, I don't think, I think that there's, one false statement would be sufficient. However... Even though the jury returned a general verdict, and we don't know which one it might have rested its verdict on? Well, we don't, and that's sort of an issue. So what's the case law on that point? I think that we don't know what the jury verdict was, and I would think that this court could reverse the conviction, even if there was evidence that one of those three statements was false. You don't have any case law that says that at your fingertips, I gather? No, I'd be happy to submit a 28-J letter to answer that point more fully, Your Honor. Sure, and I'll ask your opponent the same question. You are two minutes over your time. You wanted to reserve two minutes for rebuttal. I'll give you that. But let's have you sit down, and we'll hear from the government next. May it please the Court, Daniel Zip on behalf of the United States. Your Honor, viewed in a light most favorable to the prosecution, a rational trier of fact in this case could have found the elements of each of the charged offenses. Let's talk first about the 1014 charge. I'll just put the same question I just put to your opponent, to you. I'm not persuaded on the delinquency, because I think there's at least a good faith. He could have had a good faith belief that he wasn't yet delinquent, at least at the time that all this went down. So let's say we concluded that there was sufficient evidence for two of the three, but not for one. We have a general verdict. We don't know which false statement or statements the jury relied on. What does the case law tell us about whether the conviction is still valid? Your Honor, it's my understanding that all the United States needs to do is prove one false statement. Unfortunately, I don't have a specific case site for that at this moment. But it's worth noting that the defendant could have challenged the indictment ahead of trial as duplicitous, or could have asked for a unanimity instruction. None of that happened. No, I mean, it happens all the time, where the government charges more than one theory of liability for a particular count. And for whatever reason, let's say for some legal reason, one of the theories turns out to be defective. We then get a general verdict of guilt from the jury. We don't know whether they relied on the valid theory or the invalid theory. I know there is case law out there that says what the right answer is, and that's why I was hoping you guys would be able to help with that. If you have any authority on that point, I invite both of you to submit it in a 28-J letter. Thank you, Your Honor, and if I could try to convince you on the delinquency issue. The evidence that came into trial was essentially that the defendant signed the loan application and guaranteed that he was not currently delinquent on any federal debts. On the opposite side, the United States presented evidence of the judgment itself. They presented evidence of the schedule that was set, where he was to pay $25 a month while he was in prison. I thought he was supposed to pay $300 a month after he was released from prison. And they presented testimony from the U.S. Attorney's Office from a representative who said that he never made those payments. Starting in February and continuing all the way through July, every month, he stopped making the $300. But he was, that whole time, wasn't he in negotiations to try to get the amount lowered? No, Your Honor, the testimony from the U.S. Attorney's Office was that he asked at the outset for a reduction in the amount and that they refused that, and that he was uncooperative, and that he sent something like 100 handwritten notes to the U.S. Attorney's Office, sort of disputing whether or not he had to or could pay the $300. But the idea that he was in active negotiations is not supported by the record, particularly if, on a Rule 29 review, this Court is looking at the evidence most favorable to the prosecution and viewing any conflicts in our favor. Moreover, this idea that he had, that that supports the idea that he actually had a good faith belief that when he answered that he wasn't delinquent, that he was telling the truth. Again, there's no evidence of that in the record. He never testified to that. It's basically the defense arguing in closing, you should infer from the evidence X, and the United States arguing you should infer from the evidence Y. On a Rule 29 standard, the Court has to credit the United States inference and view the light most favorable to the prosecution. Remind me of this. Was there some point later in time, I'm assuming it was after closing, where he was actually sent a letter that basically said, hey, the time has come. Your first payment is now due, I don't know, October or something. Am I remembering that right?  He continued to not pay, and it wasn't saying, if you read the letter, it doesn't say now is the time, now is your first payment. It basically says your payment is due next month because you haven't been making payments for the last six months up to this point. I think read in a light most favorably to the prosecution or read just for what it is, that letter doesn't support the idea that this was some sort of prolonged negotiation between the parties. It was basically a letter saying start paying and start paying right now in October. So what was going on for what was it, seven months? He was never sent any communication saying that's what I'm trying to remember. I got the impression that there was this ongoing series like he wasn't trying to hide the ball. He was saying I can't pay this. I'm not going to be able to pay it. Can we let me try to work with you? And then it wasn't until maybe that September, October period where government finally said, you know what? No, we've rejected your entreaties. You must start paying $300 a month starting, you know, in two weeks or whatever. I thought that was the state of the record. No, Your Honor, I don't think that that's, if you look at the testimony from, I believe it was Joanne Blass from the U.S. Attorney's Office, she testified that there was that initial request to modify and that she denied that request and that he continued to send notes, 100 notes over the course of that year. But read in a light most favorably to the prosecution, it doesn't support the idea that this was some sort of ongoing negotiation or that he would have had a good faith belief that he was actually up to date on his payments as of July. What about the point counsel made about the ownership, that it was a correct statement on July 13th that if the title company or the bank had, I forget which it was going to, I assume the title company or whatever, they would have issued the title in him alone with the expectation after the close that they'd be the quit claim back. I've gone through that. When you have a trust, you often have to do that where you sign at one point and then you reconvey to the trust for tax planning purposes and whatever. So why isn't that a conclusive explanation that as of the date given his expectation about the paperwork that would have been done, that that was the correct response? I would respond in two ways. First, if you look at the language of what was actually asked on the loan application, it said in the last three years have you held property solely in your name. Regardless of whether he was planning on transferring it that day, it's still a false statement that he had held it solely in his name for the three years prior to that fact. Second, the fact remains that it wasn't transferred that day. I thought what it said. Is this paragraph F in the declarations? I don't have it in front of me. It says are you presently delinquent? It's the last one. How did you hold title to the home solely by yourself, jointly with your spouse, or jointly with another person? How did you hold title? It doesn't say anything about three years. I think it's at the top of that subparagraph at M. It says have you had an ownership interest in a property in the last three years, and then how was that held? In a property. Right, and then the subparagraphs indicate that it was his personal property and they held it over the phone, which was have you held property solely in your name, but it does say over the last three years, and more importantly, the property was not in his name at the time that he signed this because it never transferred at the time of closing. Counsel was arguing he didn't know that. Is that correct? That he didn't know that it had not transferred? Followed through on the transfer of title. I don't think there's any evidence in the record one way or the other as to what he knew or understood at the time of closing. On Rule 29 review, it basically goes in our favor. What would one answer if you've had an ownership in a property in the last three years, and let's say that as of closing, everything would have gone down as he expected, and at that point he would have held the title in his own name before then. So how would he answer on that form? He should say jointly with another person slash S, which would be solely by yourself. I would think it would be jointly with another person. It certainly wouldn't be solely by yourself if he held it for three years prior. No, it doesn't say hold for three years prior. It said, have you had an ownership in a property in the last three years? And then it says, how did you hold title? So it would be, I guess, O slash S to account for the current day. But he should have always put O at the minimum because he did. How did you hold title? So even under his theory, given the three year thing, he previously held it with his company. Yes, Your Honor. Mr. Zipp, I have a question. I take the defense's argument, make sure I understand it correctly. He thought at the time he signed these documents, the property would have been put in his name. And the reason it didn't is the jury could infer, he never testified of what was going on in his head, but the jury could draw an inference that the paperwork would go as planned and the property would be in his name. I understand his argument. Is that right? Yes, Your Honor. Now, do I understand correctly that you introduced evidence, the government introduced evidence that when this paperwork snafu came to light, he was presented with a deed that would have corrected the situation? Yes, he was contacted multiple times by the title company and by attorneys asking him to basically fix the error. Was there evidence that he said, oh gee, it was a mistake, here let me sign, where do I go ahead and sign this to fix this? Did he do that? At the very first contact with the title company, his response was cooperative, but then almost immediately that... Cooperative meaning what? Did he sign the deed? No, the employee testified that he spoke with Mr. Folsom on the phone and that he was initially cooperative about signing the documents, but then in the email exchanges that very same day, he sort of changed his tone and said, it was my understanding that this was supposed to stay in the name of Rosemont Mission, and then that just started a sort of months long campaign of... Did he make any effort to rectify this paperwork error before the charges were filed? Did he make any effort? Yeah. Did he sign the deed? No, your honor, that came at the time of sentencing so that he finally transferred the deed so that essentially the United States wouldn't seize his property. But that was after the trial was completed. Okay, thank you counsel. Thank you. Give counsel for the defendant two minutes for rebuttal. We will hold you to it, sir. Okay. Could you address, because I was taken by your argument about the title, but the language is why wouldn't he have been obligated to say O and then slash S? When was the, if the transfer had gone forward, as you say, when would that have happened? Well, it would have happened at the closing, but this is... Right, so it would have been, the correct answer would have been O and then slash S if he wanted to be technical. Well, he was answering the question that, as advised from the bank, because what happened was they did the title report. The title company found out that Rosemont Mission, the title was in Rosemont Mission, and they said, in order for us to go forward with this refinancing, we have to have the title under your name. And then they prepared the deed of the transfer. And so you're saying, well, no harm, no foul, because they knew in the past that it had been held by Rosemont. Of course. This was all with the bank's knowledge and advice as to what should occur. That's different, though, from putting on the form S because it asked, how did you hold title in the past? And he always held it. Prior to the concurrent transaction, the past, looking back, would have picked up Rosemont if they hadn't otherwise been aware of it. Well, they were already aware of that. They knew exactly how the title was held, and they wanted title held in his name solely, and that's why they suggested it. So he was answering the question consistent with what they wanted at the time. If we are to believe the government's argument, then we have to say that the bank was a conspirator in this, that the bank was aiding and abetting this false statement. If his argument is that this was a good faith mistake on his part, how do you explain his recalcitrance in getting it corrected after the mistake came to light? Well, the recalcitrance, I think that that's a mischaracterization of what was going on. But it was clear that this is what occurred. And if you look at the testimony of Andrew Zito, who was the title source employee who followed up on this particular issue after, what was supposed to happen and what the title company and Chase Bank and Mr. Folsom had agreed to is that there would be a transfer at the time of closing from Rosemont Mission to Mr. Folsom individually, and then back to Rosemont Mission. There was supposed to be two transfers. The bank was supposed to pay for the transfer. That's clear, undisputed evidence in the record. Now, after the closing, several months later, when title source realized that they screwed up, and I would add that Judge Houston found that it was title source's negligence as to why this didn't happen at the closing, because they were obligated to have the documents. But when they found this out, they approached Mr. Folsom and they asked him to sign the deed, but they only sent him one. They only sent him the deed transferring from Rosemont Mission to him individually. They never included the second deed. And when you look at the evidence in the e-mail responses, Mr. Folsom was saying, that's not what I agreed to. You're only sending me one deed. Everyone agreed to have that second deed filed. And that was, as Your Honor termed, the reason for his recalcitrance. And that doesn't demonstrate an intent to defraud, which are the other arguments that I have in terms of those particular accounts. And that recalcitrance or non-agreement was not done in furtherance of this scheme to defraud the bank. But I do want to just briefly get back to Judge Alford in terms of the discrepancy or the delinquency issue, because I don't want to lose you on that, Your Honor. In terms of Mr. Folsom's non-cooperation, that's a mischaracterization. When I cross-examined Ms. Blas-Ortiz, I asked her, what specific document did you ask Mr. Folsom that he did not provide to you? And this is on Excerpt of Record 128. Her answer, I can't recall at this time. You know, it's impossible. I again, what I'm asking you, this is Excerpt of Record 129, is that in the documents that you reviewed, you can't specifically recall what document was missing to make your evaluation. Not at this time. Yeah, right. Mr. Folsom provided complete financial transparency when he asked for the modification. And it wasn't his refusal to pay, it was his inability, his frank inability to pay. But if you look at the testimony, he was actually, on July 13th of 2013, at the time of the closing, he never received any delinquency notice. They were trying to work with him, according to Ms. Blas. And if you do the math, he actually owed $9.84 at the time, because he had prepaid while he was in custody. So having a good faith belief that he was not delinquent, I think, is not a stretch here. And I would submit on those comments. Thank you for your argument. The case just argued will stand submitted, and we are adjourned for this session.
judges: Silverman, Fisher, Watford